# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DALE OLIN | ) | |
| 2961 EAGLES COURT, | ) | |
| VINELAND, NJ 08361-7300 | ) | |
| Derivatively on Behalf of | ) | |
| UNDER ARMOUR, INC. | ) | Case No. |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| KEVIN A. PLANK | ) | JURY TRIAL DEMANDED |
| SERVE ON: | ) | |
| The Corporation Trust, Inc. | ) | |
| 2405 York Road, Suite 201 | ) | |
| Lutherville Timonium, MD 21093 | ) | |
| | ) | |
| GEORGE W. BODENHEIMER | ) | |
| SERVE ON: | ) | |
| The Corporation Trust, Inc. | ) | |
| 2405 York Road, Suite 201 | ) | |
| Lutherville Timonium, MD 21093 | ) | |
| | ) | |
| DOUGLAS E. COLTHARP | ) | |
| SERVE ON: | ) | |
| The Corporation Trust, Inc. | ) | |
| 2405 York Road, Suite 201 | ) | |
| Lutherville Timonium, MD 21093 | ) | |
| | ) | |
| JERRI L. DEVARD | ) | |
| SERVE ON: | ) | |
| The Corporation Trust, Inc. | ) | |
| 2405 York Road, Suite 201 | ) | |
| Lutherville Timonium, MD 21093 | ) | |
| | ) | |
| MOHAMED A. EL-ERIAN | ) | |
| SERVE ON: | ) | |
| The Corporation Trust, Inc. | ) | |
| 2405 York Road, Suite 201 | ) | |
| Lutherville Timonium, MD 21093 | ) | |
| | ) | |
| | | |
| KAREN W. KATZ | | |
| SERVE ON: | ) | |

The Corporation Trust, Inc.                    )
2405 York Road, Suite 201                      )
Lutherville Timonium, MD 21093ALVIN            )
BERNARD KRONGARD                               )
SERVE ON:                                      )
The Corporation Trust, Inc.                    )
2405 York Road, Suite 201                      )
Lutherville Timonium, MD 21093                 )
                                               )
WILLIAM R. MCDERMOTT                           )
SERVE ON:                                      )
The Corporation Trust, Inc.                    )
2405 York Road, Suite 201                      )
Lutherville Timonium, MD 21093                 )
                                               )
ERIC T. OLSON                                  )
SERVE ON:                                      )
The Corporation Trust, Inc.                    )
2405 York Road, Suite 201                      )
Lutherville Timonium, MD 21093                 )
                                               )
HARVEY L. SANDERS                              )
SERVE ON:                                      )
The Corporation Trust, Inc.                    )
2405 York Road, Suite 201                      )
Lutherville Timonium, MD 21093                 )
                                               )
DAVID E. BERGMAN                               )
SERVE ON:                                      )
The Corporation Trust, Inc.                    )
2405 York Road, Suite 201                      )
Lutherville Timonium, MD 21093                 )
                                               )
PATRIK FRISK                                   )
SERVE ON:                                      )
The Corporation Trust, Inc.                    )
2405 York Road, Suite 201                      )
Lutherville Timonium, MD 21093                 )
                                               )
LAWRENCE MOLLOY                                )
SERVE ON:                                      )
The Corporation Trust, Inc.                    )
2405 York Road, Suite 201                      )
Lutherville Timonium, MD 21093                 )
                                               )
                         Defendants,           )

|                                                        |     |
|--------------------------------------------------------|-----|
|                                                        | )   |
| and                                                    | )   |
|                                                        | )   |
| UNDER ARMOUR, INC.                                     | )   |
| SERVE ON:                                              | )   |
| The Corporation Trust, Inc.                            | )   |
| 2405 York Road, Suite 201                              | )   |
| Lutherville Timonium, MD 21093                         | )   |
|                                                        | )   |
| Nominal Defendant.                                     | )   |
|                                                        | )   |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Dale Olin ("Plaintiff"), by his undersigned attorneys, submits this Verified Stockholder Derivative Complaint for breach of fiduciary duties on behalf of Under Armour, Inc. ("UAI" or the "Company"), and alleges upon personal knowledge with respect to himself, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a stockholder derivative action brought on behalf of Nominal Defendant UAI against the current and certain former members of UAI's Board of Directors (the "Board") and certain current and former officers of the Company (collectively, "Defendants") for breaches of fiduciary duties.  These wrongs resulted in damages to UAI's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of federal law.

2.      This action arises out of the Defendants' knowing, conscious, and intentional failure to:  (1) adhere to accepted accounting principles regarding revenue recognition, which resulted in materially false and misleading public statements by the Company; and (2) advise the investing public for nearly two-and-a-half years that the Company was under investigation

3

by the United States Department of Justice ("DOJ") and the United States Securities and Exchange Commission ("SEC") for its accounting practices. On behalf of UAI, this action seeks damages and corporate governance reforms to remedy Defendants' breaches of fiduciary duties.

3.     According to the Company's Annual Report for 2019 filed on Form 10-K with the SEC on February 26, 2020 (the "2019 10-K"), UAI's "principal business activities are the development, marketing and distribution of branded performance apparel, footwear and accessories for men, women and youth."

4.     The Company had a twenty-six-quarter consecutive streak of 20% year-over-year revenue growth that ended in the fourth quarter of 2016. By 2019, sales growth had slowed significantly.

5.     Beginning on Sunday, November 3, 2019, the *Wall Street Journal* published a series of articles about the DOJ and the SEC "investigating Under Armour Inc.'s accounting practices in a probe examining whether the sportswear maker shifted sales from quarter to quarter to appear healthier."[1]

6.     On the morning of November 4, 2019, the Company filed a Form 8-K with the SEC stating in relevant part that UAI "confirmed to *The Wall Street Journal* that it has been responding to requests for documents and information from the SEC and DOJ regarding certain of the Company's accounting practices and related disclosures, beginning with submissions to the SEC in July 2017."

---

[1] Aruna Viswanatha & Khadeeja Safdar, *Under Armour Is Subject of Federal Accounting Probes; Justice Department, SEC examining how sportswear maker recorded revenue; company says it is cooperating with investigators*, Wall St. J. Online (Nov. 4, 2019) ("Viswanatha Article").

7.     UAI also held an earnings conference call on the morning of November 4, 2019 to discuss its third quarter 2019 results.   Defendant David E. Bergman ("Bergman"), the Company's Chief Financial Officer ("CFO"), said at the beginning of the call:

> I'd like to break from our typical company policy of not discussing any regulatory or litigation matters, and briefly address an article published yesterday regarding an investigation by the SEC and the US Department of Justice. *We have been fully cooperating with these inquiries for nearly two-and-a-half years. To this effect, we began responding back in July of 2017 to their request for documents and information.* We firmly believe that our accounting practices and disclosures were appropriate.

(Emphasis added).

8.     Class A shares of UAI stock (ticker symbol "UAA") lost $4.00 per share on November 4, 2019, or almost 19%, to close at $17.14 per share, on extremely heavy trading volume.   Class C shares of UAI stock (ticker symbol "UA") lost $3.47 per share on November 4, 2019, or over 18%, to close at $15.44 per share on extraordinarily heavy trading volume.[2]

9.     On November 15, 2019, the *Wall Street Journal* published an article, citing former UAI executives, which described some of the ways the Company manipulated its revenue recognition "to mask slowing demand in 2016 for its athletic apparel" and maintain its streak of 20% sales growth quarters.[3]   The Safdar Article confirmed "[a] criminal probe is being

---

[2] The Company has three classes of stock.   Classes A and C are publicly traded.   Each share of Class A stock entitles the holder to cast one vote on each matter to be considered at the Annual Meeting.   Class C shareholders are not entitled to vote at the Annual Meeting.   Class B Convertible Common Stock entitles the holder to cast ten votes for each share held.   Defendant Kevin A. Plank, the Company's founder, Executive Chairman and Brand Chief, and former Chief Executive Officer ("CEO"), owns all of UAI's Class B stock.   As such, he controlled 64.7% of the Company's voting power as of March 6, 2020 and continues to be UAI's controlling stockholder.

[3] Khadeeja Safdar & Aruna Viswanatha, *Under Armour Pushed To Meet Sales Goals,* Wall St. J., Nov. 15, 2019, at A1 ("Safdar Article").

led by the U.S. attorney's office in Baltimore, which is coordinating with a civil securities-fraud investigation by the [SEC]."  Moreover, according to the Safdar Article, "Under Armour said it has been cooperating with the investigations since July 2017."

10.    Later that day, the Company issued a statement admitting the Board knew about and had withheld information about the accounting issues and the federal investigations for two-and-a-half-years.  It stated, in relevant part:

> We are aware of recent media coverage concerning Under Armour's business practices. As we have stated previously, we firmly believe that our disclosures and our accounting practices have been entirely appropriate. *Our management and board of directors have reviewed this matter extensively over the past two and a half years* and stand by the Company's financial reporting. Because the investigation is ongoing, we are constrained in our response and cannot address every allegation raised in the media or by anonymous sources cited in the news.

(Emphasis added).

11.    On November 6, 2019, a stockholder class action alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") was filed naming as defendants UAI, Kevin Plank ("Plank"), Patrik Frisk ("Frisk"), Bergman, and Lawrence Molloy ("Molloy").  *Patel v. Under Armour, Inc., et al.*, Case No. 19-cv-3209-RDB (D. Md.) (the "*Patel* action").  The class period for the *Patel* action is between August 3, 2016 through November 1, 2019, inclusive.

12.    On December 17, 2019, a stockholder class action alleging similar violations of Sections 10(b) and 20(a) of the Exchange Act was filed naming as defendants UAI, Plank, Frisk, Bergman, Brad Dickerson,[4] and Molloy.  *Waronker v. Under Armour, Inc., et al.*, Case No. 19-cv-3581-RDB (D. Md.) (the "*Waronker* action").  The class period for the *Waronker*

---

[4] Dickerson was UAI's former CFO and Chief Operating Officer ("COO"), holding these positions from 2008 and early 2015, respectively, until he resigned from both positions in early 2016.

action is between September 16, 2015 and November 1, 2019, inclusive.

13.     On March 23, 2017, three separate securities class actions previously filed against the Company were consolidated under the caption *In re Under Armour Securities Litigation*, Case No. 17-cv-00388-RDB (D. Md.) (the "Consolidated Securities action").  The consolidated second amended complaint was filed on November 16, 2018, following the dismissal of the initial consolidated complaint.  *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658 (D. Md. 2018).  The class period for the Consolidated Securities action is between September 16, 2015 and January 30, 2017, inclusive.  The consolidated second amended complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 against UAI and Plank for false and misleading statements regarding the Company's declining demand for its apparel and excess inventory and Section 20A against Plank for insider trading.

14.     The consolidated second amended complaint was dismissed with prejudice on August 19, 2019, *In re Under Armour Securities Litigation*, 409 F. Supp. 3d 446 (D. Md. 2019), and the plaintiffs appealed to the Court of Appeals for the Fourth Circuit.  On November 18, 2019, following the revelations in the *Wall Street Journal* and the Company's admissions that the Board was aware of the federal investigation for two-and-a-half years, the Consolidated Securities plaintiffs filed a Request for an Indicative Ruling Under Fed. R. Civ. P. 62.1 with the District Court asking that "the Court issue a ruling stating either that it would grant Plaintiffs' Motion for Relief from the Court's September 9, 2019 Judgment Pursuant to Fed. R. Civ. P. 60(b) . . . if the Fourth Circuit remands for that purpose or that Plaintiffs' 60(b) Motion raises a substantial issue."  The Consolidated Securities plaintiffs also filed a Motion for Relief from Judgment under Rule 60(b) on November 18, 2019.

15.     On January 21, 2020, the Consolidated Securities plaintiffs moved to consolidate the *Patel* and *Waronker* actions with the Consolidated Securities action.

16.     On January 22, 2020, the District Court granted the Consolidated Securities plaintiffs' Rule 62.1 Request for an Indicative Ruling and stated it would grant the Rule 60(b) motion for relief from judgment if the matter was remanded by the Fourth Circuit.  In a separate opinion, the District Court explained its rationale for granting the Rule 60(b) motion.  *In re Under Armour Sec. Litig.*, 2020 U.S. Dist. LEXIS 11383 (D. Md. Jan. 22, 2020).  The court found that the *Wall Street Journal* articles and the Company's admissions it had been responding to the federal investigation since July 2017 were "newly discovered evidence" sufficient to relieve the Consolidated Securities plaintiffs from the court's final judgment.  The court also stated "[u]pon remand, this Court would consolidate this matter with *Patel* . . . and *Waronker* . . . and appoint the Lead Plaintiff of this action as Lead Plaintiff over the consolidated cases."  *Id*. at *7.[5]

17.     On January 27, 2020, the Consolidated Securities plaintiffs-appellees moved the Fourth Circuit to remand the matter to the District Court in light of its January 22, 2020 ruling on their Rule 62.1 request.  The motion was granted on August 13, 2020, and the matter has been remanded to the District Court.  *In re Under Armour Sec. Litig.*, 2020 U.S. App. LEXIS 25732 (4th Cir. Aug. 13, 2020) (per curiam).

18.     The Company is subject to substantial criminal and civil fines and penalties resulting from the DOJ and SEC investigation, as well as a significant civil judgment or

---

[5] The court also stated it "would permit Plaintiffs to file a Third Amended Complaint bringing *only* Exchange Act Claims against *only* Defendants Under Armour and Kevin Plank" because plaintiffs had agreed to dismiss all other claims against all other defendants.  *Id*. at *7 & n.1 (emphasis in original).

settlement in the Consolidated Securities action, in addition to the costs and expenses associated with the DOJ and SEC investigation.

19.     On July 22, 2020, UAI, Plank, and Bergman received Wells Notices from the SEC.   "A 'Wells Notice' is a letter sent by a securities regulator to a prospective respondent, notifying him of the substance of charges that the regulator intends to bring against the respondent, and affording the respondent with the opportunity to submit a written statement to the     ultimate     decision     maker."     Legal     Information     Institute, https://www.law.cornell.edu/wex/wells_notice.

20.     The July 22, 2020 Wells Notices informed the Company, Plank, and Bergman that the SEC Staff made a preliminary determination recommending that the SEC file an enforcement action against them based on the SEC's investigatory findings with regards to federal securities law violations.   The Wells Notices followed the SEC investigation that commenced over three years ago, in July 2017, and concerns the Company's accounting treatment of its sales and related disclosures.

21.     The DOJ and SEC investigation, the Wells Notices, and the Consolidated Securities action were all the result of breaches of the fiduciary duties of due care, loyalty, good faith, and candor by Defendants, who knowingly, consciously, and intentionally failed to adhere to accepted accounting principles regarding revenue recognition, which resulted in materially false and misleading public statements by the Company, and who knowingly, consciously, and intentionally failed to advise the investing public for nearly two-and-a-half years that the Company was under investigation by the DOJ and the SEC for its accounting practices.

22.     The Company has conceded the entire Board has been aware of the revenue recognition issue and the government investigation since July 2017.   Breaches of the fiduciary

duties of loyalty, good faith, and candor are not subject to indemnification or exculpation.

## JURISDICTION AND VENUE

23.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332(a), (c).  Plaintiff and defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  This action is not a collusive one to confer jurisdiction on this Court.

24.     This Court has jurisdiction over each defendant named herein because each defendant is an individual who has sufficient minimum contacts with Maryland so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.  The defendants had continuous and systematic contacts with Maryland through the Company's conduct of its business and its Baltimore, Maryland corporate headquarters.

25.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1401 because one or more of the defendants, including UAI, either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this complaint occurred in this District.

## THE PARTIES

26.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of UAI Class A and Class C common stock.  Plaintiff is a citizen of New Jersey.

27.     Nominal Defendant UAI is a Maryland corporation and maintains its principal executive offices at 1020 Hull Street, Baltimore, Maryland 21230.  UAI's common stock is traded on the NYSE under the ticker symbols "UAA" (Class A) and "UA" (Class C).

**<u>Current Directors</u>**

28.     Defendant Plank is the Founder of UAI and served as the Company's CEO and Chairman of the Board from 1996 until January 1, 2020.  Plank has been the Company's Executive Chairman of the Board and Brand Chief since then.  In 2016, Plank was compensated a total of $2,033,575.  In 2017, Plank was compensated a total of $4,034,341.  In 2018, Plank was compensated a total of $6,556,629.  In 2019, he was compensated a total of $5,954,169. Plank is a citizen of Maryland.

29.     Defendant Frisk became CEO and a member of the Board on January 1, 2020. Frisk also serves as the Company's President.  Frisk was COO of the Company from July 2017 until he became the Company's CEO.  Frisk is a citizen of New Hampshire.

30.     Defendant George W. Bodenheimer ("Bodenheimer") has been a member of the Board of the Company since August 2014.  Bodenheimer is a member the Compensation Committee and a member of the Corporate Governance Committee.  In 2018, Bodenheimer was compensated $225,000.  In 2019, he was compensated $235,000.  Bodenheimer is a citizen of Connecticut.

31.     Defendant Douglas E. Coltharp ("Coltharp") has been a member of the Board of the Company since December 2004.  Coltharp is Chair of the Finance and Planning Committee and Chair of the Audit Committee.  In 2018, Coltharp was compensated $235,000.  In 2019, he was compensated $250,000.  Coltharp is a citizen of Alabama.

32.     Defendant Jerri L. DeVard ("DeVard") has been a member of the Board of the Company since May 2017.  DeVard is a member of the Compensation Committee and a member of the Corporate Governance Committee.   In 2018, DeVard was compensated $225,000.  In 2019, she was compensated $235,000.  DeVard is a citizen of Florida.

33.     Defendant Mohamed A. El-Erian ("El-Erian") has been a member of the Board of the Company since October 2018.  El-Erian is a member of the Audit Committee and the Finance and Capital Planning Committee.  In 2018, El-Erian was compensated $206,250.  In 2019, he was compensated $245,000.  El-Erian is a citizen of California.

34.     Defendant Karen W. Katz ("Katz") has been a member of the Board of the Company since October 2014.  Katz was a member of the Audit Committee and is a member of the Finance and Capital Planning Committee.  In 2018, Katz was compensated $225,000.  In 2019, she was compensated $245,000.  Katz is a citizen of Texas.

35.     Defendant Eric T. Olson ("Olson") has been a member of the Board of the Company since July 2012.  Olson is Chair of the Corporate Governance Committee.  In 2018, Olson was compensated $225,000.  In 2019, he was compensated $238,201.  Olson is a citizen of Florida.

36.     Defendant Harvey L. Sanders ("Sanders") has been a member of the Board of the Company since November 2004.  Sanders is Chair of the Compensation Committee.  In 2018, Sanders was compensated $237,500.  In 2019, he was compensated $242,500.  Sanders is a citizen of New York.

**Current Officer**

37.     Defendant Bergman has been CFO of the Company since November 2017. Bergman joined the Company in 2005 and served as Corporate Controller from 2006 to October 2014, as Vice President of Finance and Corporate Controller from November 2014 to January 2016, as Senior Vice President of Corporate Finance from February 2016 to January 2017, and as acting CFO from February 2017 to November 2017.  In 2017, Bergman was compensated a total of $ 2,475,414.  In 2018, Bergman was compensated a total of $ 2,623,821.  In 2019, he

was compensated a total of $2,381,561.  Bergman is a citizen of Maryland.

**Former Officer and Directors**

38.     Defendant Molloy was CFO of the Company from January 2016 until February 3, 2017, when he resigned from his position for "personal reasons."  Molloy is a citizen of Maryland.

39.     Defendant Alvin Bernard Krongard ("Krongard") was a member of the Board of the Company from July 2005 until April 2020.  Krongard was Chair of the Audit Committee. Krongard is a citizen of Maryland.

40.     Defendant William R. McDermott ("McDermott") was a member of the Board of the Company from August 2005 until January 1, 2020.  McDermott was Chair of the Corporate Governance Committee.  McDermott is a citizen of California.

41.     The defendants identified in paragraphs 28 through 40 are collectively referred to herein as the "Defendants."

42.     The defendants identified in paragraphs 28 through 36 are collectively referred to herein as the "Demand Defendants."

## DEFENDANTS' FIDUCIARY DUTIES

43.     By reason of their positions as officers, directors, and/or fiduciaries of UAI, and because of their ability to control the business and corporate affairs of UAI, Defendants owe and owed UAI and its shareholders fiduciary obligations of due care, good faith, loyalty, and candor, and were required to use their utmost ability to control and manage UAI in a fair, just, honest, and equitable manner.  Defendants were required to act in furtherance of the best interests of UAI and its shareholders to benefit all shareholders equally, and not in furtherance of their personal interests or benefit.  Each director and officer of the Company owes and owed

to UAI and its shareholders a fiduciary duty to exercise good faith in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

44.     Defendants, because of their positions of control and authority as directors and/or officers of UAI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company, the members of the Board, and UAI's Executive Officers.  Because of their advisory, executive, managerial, and directorial positions with UAI, each of the Defendants had knowledge of material non-public information regarding the Company.

45.     To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, Defendants were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner to make it possible to provide the highest quality performance of its business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, as well as all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders were made with due candor in a timely and complete fashion, including disseminating truthful and accurate statements to the SEC and the investing public; and

(d)      When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

46.      Each of the Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with other Defendants.

47.      The Board has an Audit Committee.  According to its charter, in carrying out its general responsibilities, the Audit Committee is required to, among others:

- •       Discuss with management and the independent auditors significant accounting and reporting issues, including recent professional and regulatory pronouncements, and understand their effect on the financial statements.

- •       Inquire of management, other internal staff, the internal auditor and/or the independent auditor about significant financial risks or exposures, the Company's processes and policies for risk assessment and the steps management has taken to minimize such risks to the Company.

48.      The Audit Committee's charter requires the Committee to do the following with respect to the Company's financial statements:

- •       Review with management and the independent auditor (and where appropriate the internal auditor) at the completion of the annual and, where applicable, each quarterly examination:

    a.       the Company's annual audited and quarterly financial statements, and in the case of quarterly financial statements, the results of the independent auditor's reviews of the quarterly financial statements;

    b.       analyses prepared by management and/or the independent auditor setting forth the significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

                              ***

    f.       changes in accounting methods, off-balance sheet transactions and

related party transactions;

\*\*\*

    i.    *Consider judgmental areas such as those involving valuation of assets and liabilities, including, but not limited to, the accounting for and disclosure of obsolete or slow-moving inventory*, litigation reserves, and other commitments or contingencies.

•    Consider the independent auditor's reports and judgments brought to the attention of the Committee about the quality and appropriateness of the Company's accounting principles as applied in its financial reporting, significant accounting policies, audit conclusions regarding the reasonableness of significant accounting estimates and any audit adjustments[.]

•    *Review and consider information received from the independent auditor regarding all critical accounting policies and practices to be used by the Company*, all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management of the Company, ramifications of the use of such alternative disclosures and treatments, the treatment preferred by the independent auditor, and other material written communications from the independent auditor. . . .

(Emphasis added).

49.    The Audit Committee also has duties concerning UAI's periodic SEC filings.

The Committee must:

•    Review with management and the independent auditors the financial information to be included in the Company's Annual Report on Form 10-K and the Company's Quarterly Reports on Form 10-Q, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), their judgment about the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments, the clarity of the disclosures in the financial statements, MD&A, selected financial data and market risk and the adequacy of internal controls.

•    Make a determination whether to recommend to the Board of Directors that the audited financial statements be included in the Company's Form 10-K.

50.    The Audit Committee charter assigns certain ongoing and other responsibilities

to the Committee.  They include:

- • Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement.

- • Report regularly to the full Board and review any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the independent auditor, or the performance of the internal audit function.

- • Obtain information it deems appropriate, through discussion with management and from written reports, and make recommendations to the Board, if the Committee determines such action is appropriate, on the following:

    a. the legal environment, including the status of any pending lawsuits or administrative proceedings that would have a significant effect on the Company's financial statements and related accruals . . . .

- • Discuss, in advance, the Company's earnings releases and instances in which the Company may provide earnings guidance or financial information to analysts or rating agencies.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

51. In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52. During all times relevant hereto, Defendants, collectively and individually, initiated a course of conduct that was designed to and did enhance their executive and directorial positions at the Company and the profits, power, and prestige that Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, Defendants, collectively and individually, took the actions set forth herein.

53.     Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, Defendants made, caused, or permitted the Company to engage in improper accounting practices and to make materially false and misleading statements.

54.     The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise their violations of law and breaches of fiduciary duty, and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

55.     Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to release, purposefully or recklessly, improper statements and conceal adverse material information.  Each of the Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

56.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to assist substantially the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of this overall contribution to and furtherance of that wrongdoing.

## DERIVATIVE ALLEGATIONS

57.     This is a stockholder derivative action to which Maryland substantive law is applicable.

58.     The "Relevant Period" for this action is August 3, 2016 through November 15, 2019, inclusive.  Plaintiff has held UAI common stock continuously at all times during the Relevant Period.

59.     As detailed in the section entitled "Demand Is Futile," *infra*, making a demand on the Board would be futile.  Plaintiff has standing to proceed in this stockholder derivative action.

60.     Plaintiff will adequately and fairly represent the interests of UAI and its stockholders in enforcing and prosecuting its rights, and has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## SUBSTANTIVE ALLEGATIONS

61.     UAI was founded in 1996.  The Company went public in 2005 and grew quickly, with a streak of twenty-six consecutive quarters of at least 20% year-over-year revenue growth that was broken at the end of 2016.

62.     On August 3, 2016, UAI filed a Quarterly Report on Form 10-Q with the SEC for the quarter ended June 30, 2016.  It stated, among other things:

Seasonality

Historically, we have recognized a majority of our net revenues and a significant portion of our income from operations in the last two quarters of the year, driven primarily by increased sales volume of our products during the fall selling season, including our higher priced cold weather products, along with a larger proportion of higher margin direct to consumer sales. The level of our working capital generally reflects the seasonality and growth in our business.

63.     The Form 10-Q was accompanied by certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Plank and Molloy attesting to the soundness of the Company's internal control over financial accounting and the lack of untrue statements of material fact or omissions to state a material fact or fraud.  The certifications stated:

1.  I have reviewed this quarterly report on Form 10-Q of Under Armour, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

*** 

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

64.   On September 7, 2016, Molloy presented at the Goldman Sachs Global Retailing Conference and claimed, among other things, the Company's inventory was "really healthy" and the previous winter's "excess inventory" had been cleared without "participat[ing] too much in the promotional environment."

65.   However, on October 25, 2016, Molloy said during an earnings conference call following the release of UAI's third quarter results that the Company's margins declined more than expected because of factors such as higher discounts, promotions, and liquidations. Nevertheless, Plank continued to tout the Company's continuing consecutive streak of 20%+ quarters of revenue growth, and Molloy claimed its inventory was in "really good shape."

66.   On November 2, 2016, UAI filed a Form 10-Q with the SEC for the quarter ended September 30, 2016.  This Form 10-Q contained the same language about seasonality and

the same SOX certifications as the previous Form 10-Q.

67.    The Form 10-Qs filed by the Company with the SEC on May 9, August 8, and November 9, 2017, and on May 10, 2018, contained the same seasonality language and the same SOX certifications as the previous Form 10-Qs except the CFO certifications were signed by Defendant Bergman, who had replaced Molloy after his resignation.

68.    All Form 10-Qs subsequently filed by the Company with the SEC omitted this language.

69.    On January 31, 2017, before the markets opened, UAI issued a press release announcing its fourth quarter and full year results for 2016.  The Company's results were deeply disappointing to investors.  The Company disclosed:

### Fourth Quarter 2016 Review

- **Revenues** *were up 12 percent* to $1.3 billion, driven by a 5 percent increase in wholesale revenues to $742 million and a 23 percent increase in direct-to-consumer revenues to $518 million. North American revenues grew 6 percent. International revenues, which represented 16 percent of total revenues in the quarter, were up 55 percent (up 60 percent currency neutral) driven by significant growth in the U.K., Germany, China and Australia. Apparel revenues increased 7 percent to $929 million including strength in golf and basketball. Footwear revenues increased 36 percent to $228 million driven by accelerated growth in running and basketball. Accessories revenues increased 7 percent to $104 million with strength in bags and headwear.
- **Gross margin** was 44.8 percent compared with 48 percent in the prior year's period, as benefits from more favorable product costs were offset by aggressive efforts to manage inventory, changes in foreign currency and the outperformance of footwear and international businesses in the overall mix, which carry lower margins than our apparel and North American businesses.
- **Selling, general and administrative** expenses grew 9 percent to $420 million, or 32.1 percent of sales (down 70 basis points), due to continued investments in the company's highest growth businesses: footwear, international, and direct-to-consumer.
- **Operating income** *declined* 6 percent to $167 million. Net income decreased 1 percent to $105 million and diluted earnings per share for the fourth quarter of 2016 were $0.23 compared with $0.24 in the prior year's

period.

*Full Year 2016 Review*

- **Revenues** increased 22 percent to $4.8 billion (up 23 percent currency neutral) including a 19 percent increase in wholesale revenues to $3.1 billion and a 27 percent increase in direct-to-consumer revenues which reached $1.5 billion. Direct-to-consumer revenues reached 31 percent of total revenues compared with 30 percent in 2015. North American revenues grew 16 percent and international revenues grew 63 percent (up 69 percent currency neutral). For the full year, international revenues represented 15 percent of total revenues, compared with 11 percent in 2015. Apparel revenues increased 15 percent to $3.2 billion led by growth in golf, basketball and training. Footwear revenues grew 50 percent to reach $1 billion driven by balanced growth across all categories with particular strength in running and basketball. Accessories revenues increased 17 percent to $407 million with strength in bags and headwear and Connected Fitness increased 51 percent to $80 million.
- **Gross margin** was 46.5 percent compared with 48.1 percent as benefits from more favorable product costs were offset by efforts to manage inventory, changes in foreign currency and the outperformance of the footwear and international businesses in the overall mix, which carry lower margins than the apparel and North American businesses.
- In line with revenue growth, full year **selling, general and administrative** expenses grew 22 percent and reached $1.8 billion, or 37.8 percent of revenues.
- **Operating income** increased 3 percent to $420 million and net income grew 11 percent to $259 million. Diluted earnings per share for full year 2016 were $0.45 per share for Class A and B shares and $0.71 per share for Class C shares, reflecting the impact of a $59 million stock dividend paid to Class C shareholders during the second quarter. If the Class C stock dividend had not been paid, non-GAAP diluted earnings per share for all classes for 2016 would have been $0.58 per share. This compares with diluted earnings per share of $0.53 for all classes in 2015.

(Emphasis added).

70.     The Company's twenty-six consecutive quarters of at least 20% year-over-year revenue growth had ended.  Operating income declined in the fourth quarter.  In addition, earnings for the full year were below expectations, and the Company lowered its guidance for 2017.

71.     Investors were shocked by the news.  The Company's Class C stock, which

closed at $28.94 per share on January 30, 2017, lost $7.45, or more than 25%, to close at $21.49

per share on trading volume that was well over ten times greater than that of a typical day.  The

Company's Class A stock, which closed at $25.09 per share on January 30, 2017, lost $5.87, or

more than 23%, to close at $19.22 per share on trading volume that was nearly twenty times

greater than that of a typical day.

72.     UAI's annual reports for the fiscal years ended December 31, 2016 (Form 10-K,

filed with the SEC on February 23, 2017) (the "2016 10-K"), December 31, 2017 (Form 10-K,

filed with the SEC on February 28, 2018) ("the "2017 10-K"), and December 31, 2018 (Form

10-K, filed with the SEC on February 25, 2019) ("the 2018 10-K") contained the following

statement in the "Business" section:

Seasonality

Historically, we have recognized a majority of our net revenues and a significant
portion of our income from operations in the last two quarters of the year, driven
primarily by increased sales volume of our products during the fall selling
season, including our higher priced cold weather products, along with a larger
proportion of higher margin direct to consumer sales. The level of our working
capital generally reflects the seasonality and growth in our business. We
generally expect inventory, accounts payable and certain accrued expenses to be
higher in the second and third quarters in preparation for the fall selling season

73.     The 2016 10-K contained the following statement in the "Management's

Discussion and Analysis of Financial Condition and Results of Operations" section:

Historically, we have recognized a majority of our net revenues and a
significant portion of our income from operations in the last two quarters of the
year, driven primarily by increased sales volume of our products during the fall
selling season, including our higher priced cold weather products, along with a
larger proportion of higher margin direct to consumer sales. Seasonality could
have an impact on the timing of accruals if the sales in the last two quarters of
the year do not materialize. The level of our working capital generally reflects
the seasonality and growth in our business. We generally expect inventory,
accounts payable and certain accrued expenses to be higher in the second and
third quarters in preparation for the fall selling season.

*** 

*Revenue Recognition*

Net revenues consist of both net sales and license and other revenues. Net sales are recognized upon transfer of ownership, including passage of title to the customer and transfer of risk of loss related to those goods. Transfer of title and risk of loss are based upon shipment under free on board shipping point for most goods or upon receipt by the customer depending on the country of the sale and the agreement with the customer. In some instances, transfer of title and risk of loss take place at the point of sale, for example at our brand and factory house stores. We may also ship product directly from our supplier to the customer and recognize revenue when the product is delivered to and accepted by the customer. License revenues are primarily recognized based upon shipment of licensed products sold by our licensees. Sales taxes imposed on our revenues from product sales are presented on a net basis on the consolidated statements of income and therefore do not impact net revenues or costs of goods sold.

We record reductions to revenue for estimated customer returns, allowances, markdowns and discounts. We base our estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by us. The actual amount of customer returns and allowances, which is inherently uncertain, may differ from our estimates. If we determine that actual or expected returns or allowances are significantly higher or lower than the reserves we established, we would record a reduction or increase, as appropriate, to net sales in the period in which we make such a determination. Provisions for customer specific discounts are based on contractual obligations with certain major customers. Reserves for returns, allowances, markdowns and discounts are recorded as an offset to accounts receivable as settlements are made through offsets to outstanding customer invoices. As of December 31, 2016 and 2015, there were $146.2 million and $94.5 million, respectively, in reserves for customer returns, allowances, markdowns and discounts.

74.    The 2017 10-K and the 2018 10-K contained the identical first paragraph as the 2016 10-K, except both omitted the sentence "Seasonality could have an impact on the timing of accruals if the sales in the last two quarters of the year do not materialize." The 2017 10-K also contained identical second and third paragraphs, except the last sentence of the final paragraph stated, "As of December 31, 2017 and 2016, there were $246.6 million and $146.2 million, respectively, in reserves for customer returns, allowances, markdowns and discounts,"

noting a $100 million year-over-year increase "in reserves for customer returns, allowances, markdowns and discounts."

75.     The final two paragraphs of this section in the 2018 10-K were markedly different. They read:[6]

Revenue Recognition

*We recognize revenue pursuant to Accounting Standards Codification 606 ("ASC 606").* Net revenues consist of net sales and license and *Connected Fitness* ~~other~~ *revenue*s. Net sales are recognized upon transfer of *control* ~~ownership~~, including passage of title to the customer and transfer of risk of loss related to those goods. *Payment is due in full when title is transferred.* Transfer of title and risk of loss is based upon shipment under free on board shipping point for most goods or upon receipt by the customer depending on the country of the sale and the agreement with the customer. In some instances, transfer of title and risk of loss takes place at the point of sale, for example, at our brand and factory house stores. We may also ship product directly from our supplier to the customer and recognize revenue when the product is delivered to and accepted by the customer. License revenue is primarily recognized based upon shipment of licensed products sold by our licensees. Sales taxes imposed on our revenues from product sales are presented on a net basis on the consolidated statements of income, and therefore do not impact net revenues or costs of goods sold.

We record reductions to revenue *at the time of the transaction* for estimated customer returns, allowances, markdowns and discounts. We base *these* ~~our~~ estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by us. The actual amount of customer returns and allowances, which *are* ~~is~~ inherently uncertain, may differ from our estimates. If we determine that actual or expected returns or allowances are significantly higher or lower than the reserves we established, we would record a reduction or increase, as appropriate, to net sales in the period in which we make such a determination. Provisions for customer specific discounts are based on contractual obligations with certain major customers. Reserves for returns, allowances, markdowns and discounts are *included within customer refund liability and the value of inventory associated with reserves for sales returns are included within prepaid expenses and other current assets on the consolidated balance sheet* ~~recorded as an offset to accounts receivable as settlements are made through offsets to outstanding customer invoices~~. *As of December 31, 2018*

---

[6] Language appearing for the first time is italicized; language deleted from previous Form 10-Ks is struck through.

*there were $301.4 million in reserves for returns, allowances, markdowns and discounts within customer refund liability and $113.9 million as the estimated value of inventory associated with the reserves for sales returns within prepaid expenses and other current assets on the consolidated balance sheet.* As of December 31, 2017, there were $246.6 million in reserves for customer returns, allowances, markdowns and discounts within accounts receivable, net. *Refer to Note 2 to the Consolidated Financial Statements for a further discussion of revenue recognition.*

76.     The Company explained the switch to ASC 606 in the 2018 10-K as follows:

Recently Adopted Accounting Standards

        In May 2014, the FASB issued ASU 2014-09, Revenue from Contracts with Customers (Topic 606), which supersedes the most current revenue recognition requirements. This ASU requires entities to recognize revenue in a way that depicts the transfer of goods or services to customers in an amount that reflects the consideration which the entity expects to be entitled to in exchange for those goods or services. The Company adopted the provisions under this ASU on January 1, 2018 on a modified retrospective basis resulting in a cumulative-effect benefit to retained earnings of $3.5 million as of the date of adoption, relating to revenues for certain wholesale and e-commerce sales being recognized upon shipment rather than upon delivery to the customer. Under this approach, the Company did not restate the prior financial statements presented. The provisions under this ASU were applied to all contracts at the date of initial adoption.

        On the Company's consolidated balance sheet, reserves for returns, allowances, discounts and markdowns will be included within customer refund liability, rather than accounts receivable, net, and the value of inventory associated with reserves for sales returns will be included within prepaid expenses and other current assets. On the Company's consolidated statement of operations, certain costs associated with the Company's customer support program for its wholesale customers will now be recorded in cost of goods sold. Additionally, certain free of charge product offered with a purchase will be recorded in cost of goods sold. Previously, both of these costs were recorded in selling, general and administrative expenses. . . .

77.     The 2019 10-K modified the "Revenue Recognition" language yet again.  It said:

        We recognize revenue pursuant to Accounting Standards Codification 606 ("ASC 606"). Net revenues consist of net sales of apparel, footwear and accessories, license and Connected Fitness revenue. *We recognize revenue when we satisfy our performance obligations by transferring control of promised products or services to our customers, which occurs either at a point in time or over time, depending on when the customer obtains the ability to direct the use of*

*and obtain substantially all of the remaining benefits from the products or services. The amount of revenue recognized considers terms of sale that create variability in the amount of consideration that we ultimately expect to be entitled to in exchange for the products or services and is subject to an overall constraint that a significant revenue reversal will not occur in future periods.* Sales taxes imposed on our revenues from product sales are presented on a net basis within the consolidated statements of operations, and therefore do not impact net revenues or costs of goods sold.

Revenue transactions associated with the sale of apparel, footwear, and accessories, comprise a single performance obligation, which consists of the sale of products to customers either through wholesale or direct to consumer channels. *We satisfy the performance obligation and record revenues when transfer of control has passed to the customer, based on the terms of sale.* In our wholesale channel, transfer of control is based upon shipment under free on board shipping point for most goods or upon receipt by the customer depending on the country of the sale and the agreement with the customer. We may also ship product directly from our supplier to wholesale customers and recognize revenue when the product is delivered to and accepted by the customer. In our direct to consumer channel, transfer of control takes place at the point of sale for brand and factory house customers and upon shipment to substantially all e-commerce customers. Payment terms for wholesale transactions are established in accordance with local and industry practices. Payment is generally required within 30 to 60 days of shipment to or receipt by the wholesale customer in the United States, and generally within 60 to 90 days of shipment to or receipt by the wholesale customer internationally. Payment is generally due at the time of sale for direct to consumer transactions.

Gift cards issued to customers by us are recorded as contract liabilities until they are redeemed, at which point revenue is recognized. We also estimate and recognize revenue for gift card balances not expected to ever be redeemed ("breakage") to the extent that we do not have a legal obligation to remit the value of such unredeemed gift cards to the relevant jurisdiction as unclaimed or abandoned property. Such estimates are based upon historical redemption trends, with breakage income recognized in proportion to the pattern of actual customer redemptions.

Revenue from our licensing arrangements is recognized over time during the period that licensees are provided access to our trademarks and benefit from such access through their sales of licensed products. These arrangements require licensees to pay a sales-based royalty, which for most arrangements may be subject to a contractually guaranteed minimum royalty amount. Payments are generally due quarterly. We recognize revenue for sales-based royalty arrangements (including those for which the royalty exceeds any contractually guaranteed minimum royalty amount) as licensed products are sold by the licensee. If a sales-based royalty is not ultimately expected to exceed a

contractually guaranteed minimum royalty amount, the minimum is recognized as revenue over the contractual period. This sales-based output measure of progress and pattern of recognition best represents the value transferred to the licensee over the term of the arrangement, as well as the amount of consideration that we are entitled to receive in exchange for providing access to our trademarks.

Revenue from Connected Fitness subscriptions is recognized on a gross basis and is recognized over the term of the subscription. We receive payments in advance of revenue recognition for subscriptions and these payments are recorded as contract liabilities in our consolidated balance sheet. Related commission cost is included in selling, general and administrative expense in the consolidated statement of operations. Revenue from Connected Fitness digital advertising is recognized as we satisfy performance obligations pursuant to customer insertion orders.

We record reductions to revenue at the time of the transaction for estimated customer returns, allowances, markdowns and discounts. We base these estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by us. The actual amount of customer returns and allowances, which are inherently uncertain, may differ from our estimates. If we determine that actual or expected returns or allowances are significantly higher or lower than the reserves we established, we would record a reduction or increase, as appropriate, to net sales in the period in which we make such a determination. Provisions for customer specific discounts are based on contractual obligations with certain major customers. Reserves for returns, allowances, markdowns and discounts are included within customer refund liability and the value of inventory associated with reserves for sales returns are included within prepaid expenses and other current assets on the consolidated balance sheet. As of December 31, 2019 and 2018, there were $219.4 million and $301.4 million, respectively, in reserves for returns, allowances, markdowns and discounts within customer refund liability and $61.1 million and $113.9 million, respectively, as the estimated value of inventory associated with the reserves for sales returns within prepaid expenses and other current assets on the consolidated balance sheet. Refer to Note 2 to the Consolidated Financial Statements for a further discussion of revenue recognition.

(Emphasis added).

78.     Two years after the Company switched to ASC 606, it was still having difficulty

describing revenue recognition.

79.     The 2016 10-K stated the following in the "Controls and Procedures" section:

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures as of December 31, 2016 pursuant to Rule 13a-15(b) under the Securities Exchange Act of 1934 (the "Exchange Act"). Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2016, our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Refer to Item 8 of this report for the "Report of Management on Internal Control over Financial Reporting."

There has been no change in our internal control over financial reporting during the most recent fiscal quarter that has materially affected, or that is reasonably likely to materially affect our internal control over financial reporting.

80.     The 2017 10-K and the 2018 10-K contained substantially similar wording, except the 2018 10-K added the following sentence to the end of the first paragraph:  "The Company's internal control over financial reporting as of December 31, 2018 has been audited by PricewaterhouseCoopers LLP, as stated in their report which appears herein."

81.     All three 10-Ks were accompanied by SOX certifications signed by Defendants Plank and Bergman (who had replaced Molloy) attesting to the soundness of the Company's internal control over financial accounting and the lack of untrue statements of material fact or omissions to state a material fact or fraud.

82.     The 2019 10-K added the following in the "Controls and Procedures" section:

*Changes in Internal Controls*

In 2015, we began the process of implementing a global operating and financial reporting information technology system, SAP Fashion Management Solution ("FMS"), as part of a multi-year plan to integrate and upgrade our systems and processes. The first phase of this implementation became operational in July 2017, in our North America, EMEA, and Connected Fitness operations. The second phase of this implementation became operational in April 2019 in China and South Korea. We believe the implementation of the systems and related

29

changes to internal controls will enhance our internal controls over financial reporting. We also expect to continue to see enhancements to our global systems, which will then continue to strengthen our internal financial reporting controls by automating select manual processes and standardizing both business processes and relied upon reporting across our organization.

We are currently in the process of implementing FMS in our Latin America operations and expect it to become operational in 2020. As the phased implementation of this system continues, we will continue to experience certain changes to our processes and procedures which, in turn, result in changes to our internal control over financial reporting. In addition, we believe that our robust assessment provides effective global coverage for key control activities that support our internal controls over financial reporting conclusion. While we expect FMS to strengthen our internal financial controls by automating certain manual processes and standardizing business processes and reporting across our organization, management will continue to evaluate and monitor our internal controls as each of the affected areas evolve. For a discussion of risks related to the implementation of new systems, see Item 1A – "Risk Factors - Risks Related to Our Business - Risks and uncertainties associated with the implementation of information systems may negatively impact our business."

During the quarter ended March 31, 2019, we implemented controls to ensure we adequately evaluated our contracts and properly assessed the impact of the new lease accounting standard on our financial statements in connection with the adoption of ASU 2016-02 on January 1, 2019. We also implemented controls to support the new lease system and accounting under this ASU to monitor and maintain appropriate internal control over financial reporting.

83.     The Company also filed Form 10-Qs during the Relevant Period on November 2, 2016; May 9, August 8, and November 9, 2017; May 10, August 3, and November 5, 2018; and May 9, August 1, and November 8, 2019.   Each Form 10-Q was accompanied by SOX certifications signed by Defendants Plank and Bergman except for the November 2, 2016 10-Q, which was signed by Molloy, who was UAI's CFO at the time.

84.     On October 22, 2019, the Company announced that Defendant Plank would step down as CEO and become Executive Chairman and Brand Chief on January 1, 2020, and that Defendant Frisk would be appointed to the Board and become UAI's CEO on that date.

## **THE TRUTH EMERGES**

85.    As noted above, beginning on November 3, 2019, the *Wall Street Journal* began reporting that federal authorities were investigating UAI's accounting practices, in particular whether the Company shifted sales from quarter to quarter to appear healthier.  Specifically, it reported that "[DOJ] prosecutors are conducting a criminal inquiry into the matter in coordination with civil investigators at the [SEC]."[7]  The same article noted:

> When examining what are known as revenue-recognition practices, authorities generally focus on whether companies record revenue before it is earned or defer the dating of expenses to make earnings appear stronger, among other possible infractions.
>
> The company, which reported flat sales in its third-quarter results on Monday, has been restructuring its operations and struggling with weak sales in the past two years. Until then, it had been among the fastest-growing apparel makers, riding 26 straight quarters of at least 20% year-over-year revenue growth.
>
> That streak ended abruptly when Under Armour missed its sales targets in the final quarter of 2016. On Jan. 31, 2017, the company's shares plunged after it reported sales growth of 12% in the holiday quarter and cut its growth forecasts for the next year. That day, Under Armour also said its then-finance chief was leaving after a year on the job.

86.    The article also reported:

> Under Armour said it is cooperating with the Justice Department and SEC investigations. "*The company began responding in July 2017 to requests for documents and information relating primarily to its accounting practices and related disclosures,*" Under Armour said after The Wall Street Journal published this article. "The company firmly believes that its accounting practices and disclosures were appropriate."

(Emphasis added).

87.    As alleged above, UAI Class A and C stock suffered heavy losses on November 4, 2019.

---

[7] Viswanatha Article.

88.     Defendants Plank, Bergman, and Frisk attended an earnings conference call on November 4, 2019.  Bergman said during the management discussion section, "We have been fully cooperating with these inquiries for nearly two-and-a-half years. To this effect, we began responding back in July of 2017 to their request for documents and information. We firmly believe that our accounting practices and disclosures were appropriate."  Bergman subsequently declined to answer an analyst's question on the subject.

89.     On November 4, 2019, the *Wall Street Journal* published an article discussing the significance of UAI's failure to disclose the DOJ-SEC investigation.  The article noted that "[t]he sportswear maker has been struggling with weak sales since 2017.  Until then, it had been among the fastest-growing clothing brands, riding 26 straight quarters of at least 20% year-over-year revenue growth."[8]  The article stated that "[a]s part of the continuing federal probe, *investigators questioned people in Baltimore*, where the company is based, *as recently as last week*" and reiterated "[w]hen examining what are known as revenue-recognition practices, authorities generally focus on whether companies record revenue before it is earned or defer the dating of expenses to make earnings appear stronger, among other possible infractions." (Emphasis added).  The article also pointed out that the Company "had three chief financial officers from 2016 to 2017," the penultimate one, Malloy, announcing his resignation on January 31, 2017, the same day as the Company's disastrous earnings release that ended its twenty-six straight quarters of at least 20% year-over-year revenue growth, and the current CFO Defendant Bergman, being elevated to acting CFO just days later.

90.     The *Patel* securities class action was filed on November 6, 2019.  The *Patel*

---

[8] Khadeeja Safdar, *Under Armour Shares Slide on News of Accounting Probe;  Executives say they have cooperated for more than two years and decline to discuss why probe wasn't disclosed*, Wall St. J. Online (Nov. 4, 2019).

action alleges that, between August 3, 2016 and November 1, 2019, inclusive, Defendants violated Sections 10(b) and 20(a) of the Exchange Act through disseminating false and/or misleading statements and/or failing to disclose that:  (1) UAI shifted sales from quarter to quarter to appear healthier, in order to facilitate the continuance of its prolonged year-over-year 20% net revenue growth; (2) undisclosed to the investing public, the Company had been under investigation by and cooperating with the DOJ and the SEC since at least July 2017; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

91.     The *Waronker* securities class action was filed on December 17, 2019.  The *Waronker* action alleges that, between September 16, 2015 and November 1, 2019, inclusive, Defendants violated Sections 10(b) and 20(a) of the Exchange Act through disseminating false and/or misleading statements and/or failing to disclose that:  (1) the Company shifted sales from quarter to quarter to appear healthier, including to keep up with the Company's long-running streak of year-over-year 20% net revenue growth; (2) the Company had been under investigation by and cooperating with the DOJ and the SEC since at least July 2017; and 3) as a result, Defendants' statements about UAI's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

92.     As noted above, the second amended complaint in the Consolidated Securities action was filed on November 16, 2018 and was dismissed with prejudice on August 19, 2019. On January 21, 2020, while the appeal and the Rule 60(b) and 62.1 motions were pending, the lead plaintiff in the Consolidated Securities action filed an unopposed motion to consolidate the *Patel* and *Waronker* actions and be reappointed as lead plaintiff.  The court filed an opinion the next day stating, among other things, that it would grant the motion to consolidate should the

matter be remanded by the Fourth Circuit.  *In re Under Armour Sec. Litig.*, 2020 U.S. Dist. LEXIS 11383 (D. Md. Jan. 22, 2020).  The Fourth Circuit remanded the matter on August 13, 2020.

93.     The Company stated repeatedly in its Form 10-Ks and 10-Qs after the Consolidated Securities complaint was initially filed that "because of the inherent uncertainty as to the outcome of this proceeding, the Company is unable at this time to estimate the possible impact of this matter."  After the *Patel* action was filed, the Company's Form 10-Q  for the quarter ended September 30, 2019 filed with the SEC on November 8, 2019 stated separately regarding both the Consolidated Securities action and the *Patel* action that, "because of the inherent uncertainty as to the outcome of this proceeding, the Company is unable at this time to estimate the possible impact of this matter."  After the *Waronker* action was filed and the court indicated its intention to consolidate *Patel* and *Waronker* with the Consolidated Securities action, the Company repeated the aforementioned statements in the Form 10-K filed on February 26, 2020 and the Form 10-Qs filed on May 11 and August 6, 2020 but used plural language regarding the *Patel* and the *Waronker* actions.

94.     On November 15, 2019, the *Wall Street Journal* published another article discussing UAI's accounting issues.[9]  The article stated, among other things:

> Former executives at Under Armour Inc., the sportswear company whose accounting is under federal investigation, said they scrambled to meet aggressive sales targets, borrowing business from future quarters to mask slowing demand in 2016 for its athletic apparel.
>
> The Baltimore company frequently leaned on retailers to take products early and redirected goods intended for its factory stores to off-price chains to book sales

---

[9] Khadeeja Safdar & Aruna Viswanatha, *Inside Under Armour's Sales Scramble: 'Pulling Forward Every Quarter'; Sportswear brand pushed early shipments, dumped goods at off-price chains to stay on growth streak, former executives say*, Wall St. J. Online (Nov. 15, 2019).

in the final days of a quarter, according to former executives in sales, logistics, merchandising and finance.

They said the company repeatedly used these and other moves to help extend a 26-quarter streak of 20% sales growth, a feat that came to an abrupt end in late 2016. Some of the executives said such end-of-quarter moves are common in the retail industry.

"It was all in the name of hitting the number, and it would happen out in the open," said a former Under Armour merchandising executive. "They [the company] didn't think there was anything improper about it."

Under Armour said it is confident in its accounting practices, revenue recognition and investor disclosures. It said it operated within standard industry practices and in compliance with generally accepted accounting principles.

*Federal investigators are conducting a probe into the company's revenue recognition and whether there were improper tactics used to shift sales . . . . Investigators are examining emails that show Under Armour's founder and chief executive, Kevin Plank, knew about efforts to move revenue between quarters, according to a person familiar with the matter.*

*Among the issues investigators are examining, according to people familiar with the matter, are Under Armour's results at the end of 2016 and the tenure of former finance chief Chip Molloy, who resigned in January 2017 on the same day the company said sales growth fell below 20%. Under Armour shares tumbled 23% that day.*

A criminal probe is being led by the U.S. attorney's office in Baltimore, which is coordinating with a civil securities-fraud investigation by the Securities and Exchange Commission, the people said. Mr. Molloy didn't respond to requests for comment. The former executives who described efforts to meet quarterly targets said they hadn't been interviewed by investigators.

*Under Armour said it has been cooperating with the investigations since July 2017.*

*"Our management and board of directors have extensively reviewed this matter over the past two and a half years, and we continue to believe that our accounting practices and related disclosures have been appropriate," the company said.* Analysts and accounting experts agree the end-of-quarter maneuvers described by these executives are generally permitted under accounting rules.

Former executives said pulling sales forward helped the sportswear company sustain its growth record, which employees knew was important to Mr. Plank. On several earnings calls, Mr. Plank boasted about the streak, including the third

quarter of 2016.

"Our financial results are an incredible accomplishment for any brand and something that we believe separates us from others in our business," Mr. Plank said on Oct. 25, 2016.

That day, the Baltimore company acknowledged it was seeing a slowdown in the North American apparel industry and feeling the impact of bankruptcies of retailers such as Sports Authority Inc. Executives said they needed to boost investments, hurting profits, but reiterated their goal of 20% sales growth in the fourth quarter of 2016, as well as in 2017 and 2018.

"We want to be clear, our demand is still there," Mr. Plank said. Sales ended up rising 12% in the fourth quarter and 3% and 4% in 2017 and 2018, respectively.

Former employees described efforts in 2016 to sustain the 20% quarterly growth rate, even as retailers failed to sell some of the company's sweatshirts, T-shirts and other apparel. *"It was a pretty common practice to pull forward orders from the month after the quarter to ship within the quarter in order to hit the number or close the gap," a former sales executive said.*

When retailers declined to take products before their requested ship date, Under Armour sometimes adjusted the terms of the contract to offer a discount or extend the period in which retailers could pay for the products, this former executive and other employees said. *"Problem is once this starts it doesn't seem to stop," the sales executive said. "We found ourselves pulling forward every quarter."*

Another former executive said Under Armour had negotiations with customers about shipping products earlier than planned, but always got their approval. "I never witnessed anything where we would just ship something unbeknownst to a customer," the executive said. "If the customer accepted and you have a conversation about it, that's all good."

*Shipping plans in the final days of the quarter sometimes contradicted the dates on the boxes, and truckloads of unopened boxes would come back to Under Armour, a former logistics executive said.*

There is no rule prohibiting manufacturers from urging customers to accept early sales to meet quarterly expectations, said Ethan Rouen, a professor at Harvard Business School. "If there is an explicit or implied favor being involved, then that's problematic," he said.

*Still, efforts to shift sales between quarters can hurt investors, said Mr. Rouen. "If you're mortgaging the future, it's eventually going to catch up," he said.*

The strains in Under Armour's business were evident inside the company in 2016, several former executives said. Sports Authority, a major customer, filed for bankruptcy protection that spring and closed its remaining locations that summer. "The slowdown was occurring in more places than just there," the former sales executive said. "They just amplified the issue."

*After it was clear Sports Authority was in trouble, Under Armour continued shipping products to the retailer, booking sales for those goods, according to former executives.* Sports Authority's collapse eventually left Under Armour looking for other outlets, they said.

In July 2016, Mr. Plank announced a deal with Kohl's Corp., a department store, to carry Under Armour gear the following year. The move gave the company hundreds of new locations to stock its goods, including inventory meant for Sports Authority, the former executives said. Kohl's didn't immediately respond to a request for comment.

It also angered the company's biggest customer, Dick's Sporting Goods Inc., these executives said. As a result, Dick's, which was holding unsold Under Armour goods, stopped taking products early, they said. Dick's was Under Armour's biggest customer in 2015 and 2016, accounting for about $400 million of annual sales, according to securities filings. A spokesman for Dick's declined to comment.

While sales were slowing, the amount of money that Under Armour was setting aside for returns or markdowns was accelerating. In 2016, the company's revenue rose 22%, while its reserves for returns jumped 55%. The next year, revenue rose about $150 million to nearly $5 billion, while its reserve for returns jumped $100 million to $247 million, the securities filings show.

To help meet its quarterly targets, Under Armour in 2016 shipped new inventory intended for its own factory stores to off-price seller TJX Cos., the former merchandise executive said. That allowed Under Armour to immediately book the goods as revenue instead of having to wait for a customer to buy the item at its own stores.

*This executive and another former employee said Under Armour was careful to avoid shipping too much inventory to TJX so that it wouldn't have to disclose that the discounter was among its major customers in its securities filings.*

A spokeswoman for TJX, which operates the TJ Maxx and Marshalls chains, declined to comment.

(Emphasis added).[10]

95.    The Company responded the same day with an "OFFICIAL UNDER ARMOUR

STATEMENT," which said:

> We are aware of recent media coverage concerning Under Armour's business practices. As we have stated previously, we firmly believe that our disclosures and our accounting practices have been entirely appropriate. *Our management and board of directors have reviewed this matter extensively over the past two and a half years* and stand by the Company's financial reporting. Because the investigation is ongoing, we are constrained in our response and cannot address every allegation raised in the media or by anonymous sources cited in the news.

> When Under Armour speaks, we always communicate our best understanding as to the market and the Company's prospects. For many years, quarterly shifts in wholesale revenue related to timing of shipments based on financial goals; customer requests; year-to-year seasonal variance; different fiscal calendar alignments; product availability; logistics; and numerous other dynamics have been, and continue to be, part of the normal course of business practices in the apparel, footwear and retail sector. In this respect, our process for recognizing revenue and recording returns and other allowances has not changed and has always been in compliance with generally accepted accounting principles. Indeed, as reported by certain media outlets, analysts and accounting experts agree that such end-of-quarter practices are generally permitted under accounting rules.

> Under Armour has become one of the world's largest athletic performance brands through industry-defining innovation, ambitious and driven leadership, and a culture that holds itself to the highest standards of integrity including operating within standard industry business practices and always in compliance with generally accepted accounting principles.

(Emphasis added).[11]

96.    The Company's accounting deficiencies cannot be explained, reconciled, or

remediated by its switch to ASC 606 in 2018.

97.    On July 22, 2020, UAI, Plank, and Bergman received Wells Notices from the

---

[10] *Id.* (emphasis added).

[11] http://about.underarmour.com/news/2019/11/official-under-armour-statement.

SEC informing them that SEC Staff made a preliminary determination recommending that the SEC file an enforcement action against them based on the SEC's investigatory findings with regards to federal securities law violations. The Wells Notice followed the SEC investigation that commenced over three years ago, in July 2017, and concerns the Company's accounting treatment of its sales and related disclosures.

## DAMAGE TO THE COMPANY

98.    As a result of Defendants' breaches of their fiduciary duties and other wrongful conduct, UAI has suffered millions of dollars in damage.

99.    The Company has incurred substantial legal, accounting, and other professional fees as well as internal time and resources responding to the DOJ-SEC investigation, and will continue to incur expenses, as the SEC's investigation has yielded a preliminary determination that an SEC enforcement action should be brought against UAI, Plank, and Bergman.

100.    The Company may be subject to substantial criminal, civil, and/or other penalties as a result of the SEC and DOJ investigation and enforcement actions and formal charges brought pursuant to the investigation. The Company has made no direct and specific predictions as to the outcome of the investigation.

101.    The Company may be subject to a significant monetary judgment or settlement in the Consolidated Securities action. The Company has admitted, "the inherent uncertainty as to the outcome of this proceeding [makes] the Company . . . unable at this time to estimate the possible impact of this matter."

102.    Having failed to disclose the Board's and management's long-standing knowledge of the DOJ-SEC investigations, the Board's misconduct has damaged the Company's reputation with shareholders and capital markets. UAI may now have greater

difficulty raising additional capital on favorable terms.

103.     The Company suffered a massive reduction in its market capitalization on November 4, 2019 as a result of the substantial sell-off of its Class A and C stock.  The prices of both classes of UAI stock continue to languish far below their prices of just a year earlier.

104.     The Board's breaches of fiduciary duties have caused negative publicity and damage to the Company's goodwill and reputation.

105.     UAI has also been damaged by the costs incurred in compensation and benefits paid to Defendants, all of whom breached their fiduciary duties to the Company.  Defendant Plank's total compensation has increased significantly in 2017 through 2019 following the Company's 2016 accounting fiasco and the July 2017 notification that UAI was under investigation.

## DEMAND IS FUTILE

106.     The Demand Defendants constitute all of the current members of UAI's Board. Plaintiff did not issue a demand upon the Board prior to instituting this action because such a demand would be a futile, wasteful, and useless act.

*The Review Group*

107.     There is presently pending in the U.S. District Court for the District of Maryland a stockholder derivative action originally filed in July 2018 that alleges breaches of fiduciary duties similar to those in the Consolidated Securities action.  *Andersen v. Plank*, Case No. 18-cv-2239-RDB (D. Md.).  The plaintiffs in *Andersen* allege they made a written demand on the Board on July 5, 2017 "to investigate, and if warranted, commence legal action against certain of the Company's current and former directors and executive officers who violated and caused the Company to violate the federal securities laws and Maryland law . . . and who accordingly

caused the damages the Company has suffered in connection with the events underlying the [Consolidated Securities action]" (the "Demand Letter").[12]

108.    The *Andersen* complaint alleges plaintiffs' counsel received a letter on November November 10, 2017 from Fried, Frank, Harris, Shriver & Jacobson LLP ("FFHSJ") on behalf of the Company stating:

> the Company's board of directors (the "Board") constituted a group of independent and disinterested directors to review the allegations set forth in your letter. The review group, with the assistance of independent outside counsel, completed its investigation and issued a final report to the Board. A copy of the report is attached. The review group (i) found no evidence supporting the allegations set forth in your July 5, 2017 letter; and (ii) recommended that the Board decline to pursue claims against those whom you identified.
>
> At a meeting held on November 6, 2017, a majority of disinterested and independent directors voted to adopt the findings and recommendations in the report.

109.    The accompanying report identified the "review group" as Defendants Olson and Bodenheimer and their "independent outside counsel" as Williams & Connolly LLP.

110.    The report, dated October 25, 2017, concluded, among other things, "a claim predicated on [Under Armour] issuing false or misleading statements would be unlikely to succeed on the merits" and "it is unlikely that a [failure of oversight] claim—if recognized by a Maryland court—would succeed on the merits."

111.    The report did not mention the DOJ-SEC investigation.

112.    On December 7, 2017, counsel for the *Andersen* plaintiffs wrote to FFHSJ stating it was "evident" the review group did not consider the allegations in what was then the corrected consolidated amended complaint in the Consolidated Securities action.  The letter

---

[12] The *Andersen* action is currently stayed.

identified numerous allegations that were not addressed in the October 25 report and requested clarification as to what the review group did and intended to do.

113.    On February 23, 2018, FFHSJ wrote to counsel for the *Andersen* plaintiffs and said "[t]he review group has reaffirmed its October 25, 2017 report and recommendation to the Board, and the Board has reaffirmed its November 6, 2017 determination that it is not in the best interests of the Company or its stockholders to pursue the claims alleged in your demand letter of July 5, 2017."   The letter added:   "As set forth in the Under Armour Defendants' motion to dismiss filed in the currently pending securities class action in the District of Maryland, the Company's position is that there is no merit to the allegations in the plaintiffs' Consolidated Amended Complaint for Violations of the Federal Securities Laws."

114.    The February 23, 2018 FFHSJ letter did not mention the DOJ-SEC investigation.

115.    Defendants Olson and Bodenheimer, as members of the review group, found no wrongdoing with respect to the Company's accounting practices or the statements about its financial condition and recommended that the Board not pursue a derivative action on these grounds, even though they were aware of the DOJ-SEC investigation.

116.    In addition, "a majority of disinterested and independent directors voted to adopt the findings and recommendations in the report" even though they were aware of the DOJ-SEC investigation.  The purported independent members of the Board at the time of the vote who are now Demand Defendants are Defendants.

117.    Under Maryland law, demand is futile if a majority of members of the Board are so personally and directly conflicted or committed to the decision not to commence a derivative action that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule for his or her non-exculpable or indemnifiable breaches

of the fiduciary duties of good faith, loyalty, and candor.

118.    Demand Defendants Bodenheimer, Coltharp, DeVard, Katz, Olson, and Sanders, a majority of UAI's current nine-member Board, along with non-independent members Plank and Frisk, have demonstrated unequivocally that they will not permit a derivative action to proceed based up false statements and accounting irregularities.  Consequently, demand is futile regarding these issues.

119.    In addition, the creation of the review group does not mitigate the futility of Plaintiff's demand because the *recommendation* of an entity consisting of purportedly independent directors that no action should be taken in response to a shareholder demand is entitled to no special weight.  Under Maryland law, only a Special Litigation Committee ("SLC"), which is a committee of independent, disinterested directors that makes a *final decision* whether to accept a shareholder's litigation demand, *not a recommendation* to the Board, is entitled to certain presumptions regarding business judgment.

120.    The review group made a recommendation to the independent directors of the Board not to pursue the claims asserted, not a final decision.

121.    The review group therefore was not an SLC under Maryland law.

122.    The Company's utilization of the review group does not mitigate the futility of demand with respect to the allegations of false statements and accounting irregularities pending during the review group's term.

*The Company's November 2019 Statements*

123.    The Company's statements in 2019 further reinforce that demand is futile not only regarding false statements and accounting irregularities revealed after the review group completed its work, but also concerning the failure to disclose the DOJ-SEC investigation for

more than two years.

124.   The Company told the *Wall Street Journal* on November 4, 2019, that "[t]he company began responding in July 2017 to requests [from the DOJ and the SEC] for documents and information relating primarily to its accounting practices and related disclosures."[13]

125.   On November 15, 2019, the Company issued an Official Statement that "[w]e are aware of recent media coverage concerning Under Armour's business practices. As we have stated previously, we firmly believe that our disclosures and our accounting practices have been entirely appropriate. *Our management and board of directors have reviewed this matter extensively over the past two and a half years and stand by the Company's financial reporting*." (Emphasis added).

126.   Demand Defendants Plank, Bodenheimer, Coltharp, DeVard, Katz, Olson, and Sanders – seven of the nine current members of the Board – have been members of the Board since July 2017.  Demand Defendant Frisk was COO of the Company from July 2017 until he became CEO and a member of the Board in January 2020.  Demand Defendant El-Erian has been a member of the Board since October 2018.

127.   The Company has conceded that Demand Defendants Plank, Frisk, Bodenheimer, Coltharp, DeVard, Katz, Olson, and Sanders – a majority of the Board – were aware of both the underlying accounting issues and the DOJ-SEC investigation, *and* consciously refused to correct the accounting issues and consciously failed to disclose or even acknowledge the investigation to the public for nearly two-and-a-half years until it was reported in the press, not by UAI.  The same is true for Demand Defendant El-Erian, who had such knowledge and consciously failed to take action for well over a year.

---

[13] Viswanatha Article.

128.    Demand Defendants Plank, Frisk, Bodenheimer, Coltharp, DeVard, El-Erian, Katz, Olson, and Sanders – the entire current Board:

      a.      Was aware of the Company's fraudulent revenue-recognition practices;

      b.      Was aware of the DOJ-SEC investigation; and

      c.      Was aware that the Company failed to disclose the investigation to the public or did nothing to correct the accounting issues.

129.    Each and every member of the Board breached his or her fiduciary duties of good faith, loyalty, and candor by consciously permitting the Company to engage in fraudulent revenue recognition practices, including the shifting of sales from quarter to quarter to make UAI's revenues and earnings appear stronger than they were and by approving and allowing the Company to issue materially false and misleading financial statements, including annual reports, quarterly reports on Form 10-Q, and accompanying press releases and other materials and statements while failing to inform the public of the DOJ-SEC investigation.

130.    The breaches of fiduciary duty were especially egregious for the Demand Defendants who were members of the Audit Committee during the Relevant Period – Defendants Coltharp, Katz, and El-Erian.[14]  They breached their fiduciary duties of loyalty, good faith, and candor by failing to ensure the Company adhered to recognized accounting practices and made adequate public disclosures.

131.    Each and every Demand Defendant is so personally and directly conflicted or committed to the decision not to commence a derivative action that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment

---

[14] Defendant Krongard, who is not a Demand Defendant, chaired the Audit Committee for much of the Relevant Period.

rule for his or her non-exculpable or indemnifiable breaches of the fiduciary duties of good faith, loyalty, and candor.

*The 2019 Form 10-K*

132.    The Company's Form 10-K for 2019 states with respect to the *Andersen* matter and an additional consolidated stockholder derivative action originally filed in June 2018 and currently pending and stayed in Maryland state court:

> Prior to the filing of the derivative complaints . . . each of the purported stockholders had sent the Company a letter demanding that the Company pursue claims similar to the claims asserted in the derivative complaints. Following an investigation, *a majority of disinterested and independent directors of the Company determined that the claims should not be pursued by the Company* and informed each of these purported stockholders of that determination.

(Emphasis added).

133.    As a result, the entire Board has recently confirmed its determination that it will not take up the claims asserted by Plaintiff, making demand on the Board futile.

*Plank and Bergman*

134.    Demand Defendant Plank has been a member of the Board for the entire Relevant Period, and Defendant Bergman has been the Company's CFO since July 2017.

135.    Plank's total compensation has increased substantially since 2016.  *See* ¶ 28, *supra*.

136.    Bergman's total compensation has remained relatively steady since he became CFO in 2017.  *See* ¶ 37, *supra*.

137.    Both Plank and Bergman received Wells Notices from the SEC.

138.    Neither the Compensation Committee, composed of Demand Defendants Bodenheimer, DeVard, and Sanders, nor the full Board, has sought to decrease or otherwise limit the total compensation of either Plank or Bergman as a result of their illegal conduct or

breaches of their fiduciary duty.

139.    The Board did not discipline Defendants Plank, Bergman, or Molloy for their misconduct.

140.    The Board's failure to take any action against Plank, Bergman, or Molloy demonstrates that each and every Demand Defendant is so personally and directly conflicted or committed to the decision not to commence a derivative action that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule for his or her non-exculpable or indemnifiable breaches of the fiduciary duties of good faith, loyalty, and candor.

141.    For all the reasons stated above, demand on the Board is futile.

**COUNT I**
**Derivative Claim for Breach of Fiduciary Duties**
**(Against Defendants)**

142.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

143.    Each Defendant owes and owed UAI and its shareholders the highest duties of due care, loyalty, good faith, and candor in the management and administration of the Company's business and affairs.  Each Defendant was duty-bound to act in good faith at all times.

144.    Defendants each owes and owed a duty of due care, loyalty, and good faith to the Company to ensure the effectiveness of internal control systems so that they were not permitting, encouraging, or condoning the Company to engage in fraudulent revenue recognition practices.

145.    Defendants breached these duties by knowingly and consciously making,

47

allowing, or failing to correct the Company's fraudulent revenue recognition practices, including its shifting of sales from quarter to quarter in order to make UAI's revenues and earnings appear stronger than they were.

146.     Plaintiff has no adequate remedy at law.

## COUNT II
### Derivative Claim for Breach of Fiduciary Duties
### (Against Defendants)

147.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

148.     Each Defendant owed UAI and its shareholders the highest duties of due care, loyalty, and good faith, and candor to avoid making false and misleading statements to investors, analysts, and the general public about the Company and its financial condition.

149.     All of the Company's Form 10-Ks and 10-Qs filed during the Relevant Period, as well as the Company's earnings press releases and disclosures of results and guidance, as well as Defendants' statements about the Company's financial status, including but not limited to its inventory, guidance, and prospective revenue,  were materially false and misleading because they failed to advise the public that the Company engaged in fraudulent revenue recognition practices, including its shifting of sales from quarter to quarter in order to make UAI's revenues and earnings appear stronger than they were, making UAI's and Defendants' statements about the Company's business, operations, and prospects materially false and misleading at all times.

150.     In addition, beginning in July 2017, all of the Company's Form 10-Ks and 10-Qs filed during the remainder of the Relevant Period, as well as the Company's earnings press releases and disclosures of results and guidance, and those made by the Defendants, were materially false and misleading because they failed to advise the public that the Company was

under investigation by the DOJ and the SEC for its accounting practices.

151.    Plaintiff has no adequate remedy at law.


## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of UAI and that Plaintiff is an adequate representative;

B.      Declaring that Defendants have breached their fiduciary duties as alleged herein;

C.      Declaring that Defendants unjustly enriched themselves by knowingly and consciously participating in, allowing, approving, or failing to correct the Company's fraudulent revenue recognition practices and by knowingly and consciously making or allowing or approving of the materially false and misleading statements described herein;

D.      Directing Defendants to account to UAI for any damages sustained because of the wrongs complained of herein;

E.      Ordering that Defendants and those under their supervision and control refrain from further violations as are alleged herein and implement corrective measures including a system of internal controls and procedures sufficient to prevent the repetition of the acts complained of herein which will prevent their recurrence;

F.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: September 1, 2020                         **GOLDMAN & MINTON, P.C.**


                                           By:   */s/ Thomas J. Minton*
                                                 Thomas J. Minton (Bar No. 03370)
**OF COUNSEL:**                                   3600 Clipper Mill Rd., Suite 201
                                                 Baltimore, MD 21211
**RIGRODSKY & LONG, P.A.**                        Ph (410) 783-7575
300 Delaware Avenue, Suite 1220                  Fax (410) 783-1711
Wilmington, DE 19801                             tminton@charmcitylegal.com
(302) 295-5310                                   *Attorneys for Plaintiff*

**GRABAR LAW OFFICE**
1650 Market Street, Suite 3600
Philadelphia, PA 19103
(267) 507-6085